#06 76 75

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
FEB 14 2008
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **HAMMER LGC, INC.** | ) | |
| **Plaintiff,** | ) | **Case No.** |
| **vs.** | ) | **08-91 C** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

Comes HAMMER LGC, INC., (hereinafter "Hammer"), and files this, its Complaint, against the United States of America and shows unto the Court, as follows:

**I.**

**JURISDICTION**

Jurisdiction is founded upon 28 U.S.C. § 1491(a)(1), and involves claims made against the United States by and through the Department of the Navy, Naval Facilities Engineering Command Contracts, located at the Naval Air Station (hereinafter "Navy"), Meridian, Mississippi. On June 1, 2001, Hammer was awarded Contract Number N62467-00-C-0288 to build the T-45 Aircraft Support Facility for the Navy. *Hammer's Request for Equitable Adjustment and Certified Claim, Contract N62467-00-C-0288, T-45 Aircraft Support Facilities, NAS, Meridian* was submitted to the Navy and subsequently denied by a Contracting Officer Final Decision on October 22, 2007. Hammer appeals to this Court the adverse decision of the Navy Contracting Officer.

**II.**

**BACKGROUND**

1. On June 1, 2001 Hammer LGC, Inc. ("Hammer") was awarded Contract Number N62467-00-C-0288 with the United States Navy to perform certain construction projects on the Naval Air Station ("NAS") at Meridian, Mississippi.

2. The Contract Start Date was June 16, 2001, and the Contract Completion Date was May 6, 2003.

3. The Contract was awarded in the amount of $3,818,070.00.

4. The work consisted of constructing four major facilities: an ammunition magazine (Building 192); and inert bomb build-up facility (Building 193); a calibration laboratory (Building 194); and a supply warehouse (Building 195). Included in the work were renovations to a hanger (Building 002), a training facility (Building 150), and a parachute loft (Building 223).

5. The work was divided into Phase A and Phase B.

   a. Phase A consisted of all work excluding the Supply Building. Phase A was to start on June 16, 2001, and was to be completed by May 6, 2003. However, Modification P005 extended the Contract Completion Date by 17 days until May 23, 2006.

   b. Phase B consisted of design and construction of the Supply Building. The Contract Completion Date for Phase B was extended from August 24, 2002 to September 1, 2002.

6. The Navy's Resident Officer in Charge of Construction ("ROICC") office oversaw the construction project. In November 2002, the ROICC office called for a partnership meeting with Hammer to discuss several issues that had arisen with respect to the construction plans.

7. At this meeting there was heated debate, and the members of the ROICC office left the meeting with ill feelings and animosity toward Hammer, it's officers and employees.

8. On November 27, 2002 Lieutenant Richard L. Bowles, the Resident Officer-In-Charge Of Construction, had conversations with both James Dew, a Hammer employee, and L.C. Neal, Hammer's Superintendent.

9. Lt. Bowles told Mr. Dew that David Stevens, the ROICC construction manager, had left the partnership meeting very angry.

10. When Mr. Dew tried to explain Hammer's intention to appease the ROICC, Lt. Bowles told him that he did not like Hammer's Superintendent, L.C. Neal, because he did not speak to ROICC officers in the correct tone and his personality was too dry. Lt. Bowles then suggested another partnership meeting for the purpose of clearing the air.

11. He went on to state that Hammer did not know how powerful the ROICC was, and that they could keep a contractor, such as Hammer, on the base for twenty years trying to complete performance of its contract. He added that with a simple phone call he could ensure that Hammer would never work on another military base again.

12. That same day Mr. Dew had relayed to Mr. Neal the substance of his conversation with the ROICC officer. Upon hearing what Lt. Bowles had said, Mr. Neal went to the ROICC office to speak with him. Lt. Bowles stated that the entire ROICC office was angry at Hammer, including Lt. Bowles' Commanding Officer, because of what happened at the partnership meeting.

13. Lt. Bowles then said that if he had been at the meeting things would have been different, namely that he would not have let the Hammer representatives speak in harsh tones to any ROICC personnel.

14. It was Lt. Bowles position that the relationship between the ROICC office and Hammer was so strained that it could not be repaired.

15. At this point in the conversation Lt. Bowles told Mr. Neal that it was the present intention of the ROICC office to use the terms of the contract with Hammer, along with the specifications, to force them into bankruptcy and destroy Hammer's business.

16. He went on to proclaim that the ROICC could keep them on the base for another twenty years trying to complete its contractual obligations.

17. Lt. Bowles said to Mr. Neal that he had better talk his boss because this particular ROICC office does not put up with a lot of things that occur on other bases, and Hammer would be finished.

18. Mr. Neal then asked the lieutenant if he really planned on putting Hammer out of business, to which he responded, "Yes, that is our plan."

19. In furtherance of the plan to put Hammer out of business Lt. Bowles and David L. Stevens, ROICC construction manger, acted to frustrate Hammer's pursuit of performance of its contract. Hammer's quality control manager developed a heart condition and was required to step aside.

20. During the search for a replacement Mr. Stevens suggested that Hammer hire a former government employee from the ROICC office.

21. This official, and former colleague of Mr. Stevens, made an outrageous demand for compensation from Hammer, which was well over twice what was being paid to the former quality control manager.

22. This demand was denied and Hammer hired someone else to fill the position.

23. As a result of the decision not to hire Steven's friend, Stevens began to act with personal animosity toward Hammer and its employees . During this period, Mr. Stevens made numerous decisions that resulted in delay and additional cost to Hammer.

24. These decisions are characterized by Mr. Stevens' willful failure to comment on proposed construction plans, and then order that they be redone after completion.

25. Additionally, Mr. Stevens established the new practice of selecting only the most expensive construction materials and schemes.

26. Mr. Stevens has acted upon the anger alluded to by Lt. Bowles, which subsequently caused great economic harm to Hammer. Mr. Stevens has delayed and hindered Hammer's performance of its contract at almost every turn since Hammer refused to hire his former colleague.

27. The result of the efforts of Lt. Bowles, David Stevens, and the rest of the RIOCC office were extensive delay and additional cost in concert with the plan to put Hammer out of business.

28. Approximately two months after the meeting, the construction project was 92.5% complete. In finishing the final 7.5%, Hammer expended one hundred ninety-four days (194) of labor and $467,094.00 in certified payroll costs. It took only two hundred fifty-five days for Hammer to complete the other 92.5% of the project.

29. Further, the costs expended during this time for completion of 7.5% of the job, amount to roughly 12% of the original value of the entire contract.

30. The RIOCC office and its employees acted intentionally and willfully in causing delay during the performance of the contract. It is for these reasons that Hammer claims that the Navy has breached its duties under the contract and acted in bad faith.

## COUNT I

### BREACH OF THE DUTIES OF GOOD FAITH AND COOPERATION: ACTIVITY B195-0640 (Construct 8" Masonry Walls - Supply Building)

31. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

32. Building 195 ("Supply Building") was Phase B of the Contract.

33. In late July 2002, Hammer began construction of 8' masonry walls at the Supply Building. These walls were being constructed according to approved plans and specifications.

34. When the masonry wall was approximately 85 feet in length and four courses of block high the Navy contract administrators ordered Hammer to stop the work.

35. The contract administrators claimed they were concerned about the location of the bond beam in the block work due to possible seismic requirements that had not been addressed.

36. It was the Navy's position that the seismic requirement for a bond beam was every 40" instead of the 80" that had been provided for in the approved drawings.

37. Work was stopped for three (3) days so that the Navy could research this issue.

38. It was determined that Meridian NAS was in Seismic Zone 1, and subsequently determined that there were no seismic requirements in Zone 1.

39. It was at this time that the Navy established an additional requirement/reference in one of the technical guides referenced in the contract that stated that bond beams should be at every 40".

40. The Navy Contract Administrators arbitrarily required Hammer to demolish the work that had already been completed, and then rebuild so that there was a bond beam every 40".

41. The Navy required Hammer to do this even though the Final Design Analysis submitted by the AE firm and approved by the Navy clearly established that the contract requirement was for a bond beam every 80".

42. Several days later, the Navy stopped work yet again. This time Navy expressed a supposed concern about the vermiculite insulation that was specified to be placed in the block cavities in specific areas as both a sound and thermal barrier.

43. As a result of this particular work stoppage, approximately 1,500 blocks had to be demolished and removed from the site.

44. Then, the Navy stopped work a third time when the masonry subcontractor reached a height that required for scaffolding to be set up.

45. Previously, the masonry subcontractor had purchased new scaffolding specifically for this Project. Because the scaffolding was new the subcontractor was not initially familiar with its erection and safety practices.

46. However, and because of this, the manufacturer of the scaffolding provided the masonry subcontractor with a crew and safety engineer to first erect the scaffolding, and subsequently trained the masonry subcontractor on its use and safety procedures.

47. The Navy however, unreasonably stopped work yet again, until Hammer and the masonry subcontractor could persuade the Navy that the new scaffolding, which was erected by the manufacturer, met all safety requirements.

48. Ultimately, masonry work that had been scheduled for five (5) days took twenty-two (22) days to complete due to the Navy's hindrances.

49. Additionally, the Navy's interference resulted in Hammer utilizing twice the number of bond beams as established in the Final Design Analysis, which was previously approved by the Navy.

50. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

51. As a result, Hammer incurred direct cost associated with these delays and rework in the amount of $13,952.

52. Plaintiff demands judgment against the defendant in the sum of $13,952 for damages caused by the defendant's intention and willful acts of delaying and hindering the plaintiff in its performance of this contract, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT II

## BREACH OF THE DUTIES OF GOOD FAITH AND COOPERATION: ACTIVITY B195-1060 (Finish Paint Interior-Supply Building)

53. Plaintiff realleges paragraphs 1- 51 as if fully set out herein.

54. ACTIVITY B195-1060 required for Hammer to finish painting the interior of the Supply Building.

55. This activity was originally scheduled for three (3) days.

56. However, the actual time of performance it took to complete this task was 111 days.

57. The reasons for the delays are that the Navy hindered Hammers performance.

58. The work started on October 1, 2003 and was not completed until March 13, 2003.

59. One reason for the delay is because the Navy directed Hammer to paint all conduits in the mechanical room.

60. However, this was not a requirement of the contract.

61. Secondly, the Navy directed Hammer to install the government furnished fixtures prior to Hammer's completion of the painting.

62. This required that Hammer install the fixtures, and then protect and paint around the fixtures.

63. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

64. As a result, Hammer incurred additional costs in the amount of $3,872.

65. Plaintiff demands judgment against the defendant in the sum of $3,872 for damages caused by the defendant's intention and willful acts of delaying and hindering the plaintiff in its performance of this contract, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT III

## BREACH OF THE DUTIES OF GOOD FAITH AND COOPERATION: BUILDING 194 (ACTIVITY B194-0330-Calibration Lab)

66. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

67. Building 194 was part of Phase A of the Contract.

68. Hammer began work on the foundation in accordance with the approved plans and specifications.

69. After the footings had been poured the masonry subcontractor began laying block.

70. In accordance with the plans, the masonry subcontractor was inserting rebar every 48" into the block retainer wall on top of the already placed spread footings.

71. After six (6) courses of block had been laid, the Navy Contract Administrator stopped the work for a period of nine (9) days, and redesigned the rebar requirement.

72. Specifically, the Navy changed the requirement from a vertical rebar every 48" to a vertical rebar every 24".

73. This design change required that the masonry subcontractor go back and drill the footing between the rebar placed every 48" and then insert and cement additional rebar.

74. The Navy's design change required that Hammer fabricate a long masonry bit to prevent damaging the already installed block.

75. The Navy's revised rebar requirements resulted in approximately twelve (12) days of delay.

76. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

77. As a result, Hammer incurred $1,431 in additional cost for adding the additional rebar, rescheduling the slab on grade pour, and the second application of termite protection that had to be performed.

78. Plaintiff demands judgment against the defendant in the sum of $1,431 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT IV

## BREACH OF THE DUTIES OF GOOD FAITH AND COOPERATION: AVTIVITY B194-0530 (Rough-In Elec / Telecom / Fire Alarm – Calibration Lab)

79. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

80. After resuming work on the block wall at the calibration lab, the Navy stopped work once again. This time the Navy expressed a concern that the Electrical Metallic Tubing ("EMT"), which was being installed in the block wall, would corrode due to contact with the concrete that was poured into select cavities to strengthen the structure.

81. The EMT was permitted by the design specifications, and it was also the standard industry practice to use EMT in masonry wall cavities.

82. Nonetheless, the Navy refused to allow Hammer to use the EMT, and directed Hammer to tear down the masonry wall, which was approximately twelve (12) courses high, and then required Hammer to start over using PVC tubing.

83. The construction of the masonry wall was unreasonably delayed for a third time because the Navy Contract Administrator did not agree with the type of masonry block used at the concrete reinforced bond beams.

84. Hammer informed the Navy that it was utilizing the appropriate block for the bond beams.

85. Nonetheless, the Navy insisted that a lentil block, which is used over doors and windows, was the appropriate block to use.

86. Hammer then submitted documentation from the block manufacturer demonstrating that Hammer was using the correct bond beam block.

87. Finally, after two (2) weeks of additional delay, the Navy allowed the construction of this masonry wall to continue.

88. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

89. As a result, Hammer incurred additional costs for tearing down and rebuilding this wall in the amount of $28,466.

90. Plaintiff demands judgment against the defendant in the sum of $28,466 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT V

## BREACH OF THE DUTIES OF GOOD FAITH AND COOPERATION: ACTIVITY B194-0630 (Set MTL Roof Trusses – Calibration Lab)

91. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

92. The Navy hindered Hammer's performance on ACTIVITY B194-0630 in relation to installing the roof trusses, such that Hammer incurred a fourteen (14) day delay.

93. Once again the Navy allowed the work to start, but then stopped the work to question the quality control plan utilized at the plant that had manufactured the metal trusses.

94. The trusses had already been approved by the Quality Control Manager and submitted to the Navy for review sixty (60) days prior to their delivery.

95. The trusses then sat on site for a week prior to installation.

96. During this sixty-seven (67) day period there were no questions from the Navy regarding the suitability of the metal trusses.

97. After the Navy stopped the work, the truss manufacturer was required to submit a second Quality Control Plan for the Navy's review.

98. Then, Hammer was required to retain an independent structural engineer to visit the plant to certify compliance with the Quality Control Plan.

99. The same engineer was then required to witness the installation of the roof trusses.

100. On November 14, 2002, N. Brad Carter Jr., P.E., of Carter Miller Associates, Ltd., certified that the construction of the metal roof trusses was in compliance with the design specifications and drawings.

101. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

102. As a result, Hammer incurred additional costs for providing an independent engineer in the amount of $745.

103. Plaintiff demands judgment against the defendant in the sum of $745 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT VI

### BREACH OF THE DUTY OF GOOD FAITH AND COOPERATION: ACTIVITY B194-730 (Install Brick Veneer – Calibration Lab)

104. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

105. Next, the Navy interfered with Hammer's installation of the brick veneer at the calibration lab.

106. The brickwork was 4-5 feet high and went completely around the building when the Navy raised concerns that the weep holes were being blocked by mortar.

107. The Navy insisted that it was a contract requirement to wipe the excess mortar from the backside of the brickwork.

108. This is the first time Hammer had ever been informed of this supposed requirement.

109. It took fourteen (14) days to find a solution that was satisfactory to the Navy.

110. The Navy required Hammer to tear down and remove all installed brickwork, rebuild the brickwork, and then install a backing material.

111. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

112. As a result, Hammer incurred additional costs of $19,291.

113. Plaintiff demands judgment against the defendant in the sum of $19,291 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT VII

### BREACH OF THE DUTIES OF GOOD FAITH AND COOPERATION: ACTIVITY B193-340 (Pour Slab on Grade – Inert Bomb Storage)

114. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

115. Building 193 was also part of Phase A of the Contract.

116. The slab on grade for the Inert Bomb Storage building was formed and ready to pour on May 22, 2002. Termite treatment had been applied, the concrete was ordered, and the pump truck was ordered.

117. Then, the Navy ordered all work stopped until they could determine of a grounding girdle was necessary for this building.

118. After it was determined that no girdle was necessary, the concrete had to be reordered, the pump truck had to be rescheduled, and the termite treatment had to be reapplied.

119. Hammer was then allowed to proceed with no changes having been made to the design.

120. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

121. As a result, Hammer incurred additional costs for the second termite treatment in the amount of $716.

122. Plaintiff demands judgment against the defendant in the sum of $716 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT VIII

### BREACH OF THE DUTY OF GOOD FAITH AND COOPERATION: ACTIVITY B193-580 (Install Security Fence-Phase Two – Inert Bomb Storage)

123. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

124. The Navy never provided Hammer with detailed fence and gate drawings; therefore, Hammer scaled the fence dimensions and location from and approved civil drawing.

125. Hammer then laid out the location of both the fence posts and gate posts, and then pulled strings to represent the fence.

126. The Navy Contract Administrator visited the site, reviewed the fence and gate layout, and approved the work.

127. After Hammer installed the fence, the Navy Contract Administrator stated that the fence was unacceptable because a top rail had been installed, and that this did nit comply with the current Military Handbook Design Guidelines for Security Fencing, Gates, Barriers, and Guard Facilities.

128. It took two (2) weeks for Hammer to demonstrate to the Navy that they were referencing a May 14, 1993 book, which was not part of the contract documents, and that the current book in effect at the time of contract did allow a top rail. Finally, the Navy Contract Administrators conceded this point.

129. A second issue arose after the Navy conceded the issue regarding the top rail. Specifically, the Navy Contract Administrator now decided that a wider gate was needed.

130. It was the Navy's position that there was insufficient turning radius due to the fact that gate was only twenty (20) feet wide.

131. In order to demonstrate to the Navy that there was adequate room for an eighteen (18) wheeled truck and trailer, Hammer's project manager rented a truck from an independent driver, and then spent two (2) hours, with the Navy Contract Administrator present, driving the eighteen

(18) wheeled truck and trailer in and out of the gate and turning in both directions. Additionally, the truck was backed out of the gate and turned in both directions.

132. However, the Navy Contract Administrator did not change his position.

133. He directed that Hammer submit a variance to the contract, at no cost to the Government, to remove the twenty (20) foot gate posts and modify the fence to accept a thirty (30) foot gate.

134. The variance was submitted on October 23, 2002, as directed by the Navy Contract Administrator.

135. The Navy Contract Administrator responded on October 30, 2002, stating:

> Your request for variance to use 30' Swinging Gate ILO 50' is APPROVED.
>
> The Architectural Graphics Standard list 30' wide gates as standard for *two-way truck traffic for a parking lot.*

136. Building 193 is not a parking lot, and the ingress and egress roads were clearly not intended to accommodate two-way trucking traffic.

137. However, the gate to Building 193 has now been constructed for two-way trucking traffic for a parking lot.

138. Additional work, not included in the contract drawings, but required by the Navy Contract Administrator was the placement of large rocks at the base of the entire fence.

139. Hammer spent significant effort in complying with the Navy's verbal directive to add this rock.

140. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

141. As a result, Hammer incurred additional costs of $2,646 with regard to the gate, and $2,378 relating to the placement of the rock.

142. Plaintiff demands judgment against the defendant in the sum of $5,324 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT IX

## BREACH OF THE DUTIES OF GOOD FAITH AND COOPERATION: ACTIVITY B193-530 (Install Exterior Lighting – Inert Bomb Storage)

143. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

144. In late August 2002, Hammer held the required initial preparatory meetings, and then installed the work associated with Activity B193-539, as shown in the drawings and per the specifications.

145. After the light poles were installed, the Navy Contract Administrator decided that the poles were in the wrong place.

146. The Navy stated that for security reasons they wanted the poles to be moved inside the fence.

147. This revised design took six (6) weeks to develop.

148. The Navy Contract Administrator then directed Hammer, at no cost to the Government, to reduce the number of light poles from five (5) to two (2), and then to relocate the two installed light posts inside the security fence.

149. The Navy hindered Hammer in the performance of this contract activity and breached its duty of good faith and cooperation.

150. As a result, Hammer incurred additional cost in demolishing all five (5) light poles, and then relocating two (2) light poles in the amount of $8,407.

151. Plaintiff demands judgment against the defendant in the sum of $8,407 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT X

## BREACH OF THE DUTIES OF GOOD FAITH AND FAIR DEALING: ACTIVITY B193-350 (Install Site Underground Utilities – Inert Bomb Storage)

152. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

153. Hammer's Quality Control Manager initially approved the primary distribution cable regarding Activity 350.

154. However, there were conflicting specifications as to whether approval by the Navy was required; therefore, Hammer submitted this item to the Navy Contract Administrators for review.

155. Hammer also submitted a variance requesting to utilize aluminum wire instead of copper wire.

156. Hammer believes this request to have been reasonable, and subsequently provided the Navy information demonstrating that: 1) the technical guide referenced in the contract specifications allowed the use of aluminum or copper wire for underground utilities; 2) aluminum wire was currently in use on Meridian NAS in other locations; and 3) the aluminum could be procured in a timely manner, whereas it was difficult to find a supplier to procure the copper wire from.

157. Subsequently, Hammer received approval for the variance to use aluminum instead of the copper wire.

158. Hammer then purchased and installed the wire at Building 193.

159. Then, after Hammer had done this, the Navy Contract Administrators notified Hammer that SOUTHDIV had rejected the use of the aluminum wire.

160. Hammer was then required to remove the aluminum wire and procure the copper wire.

161. The Navy's Contract Administrators approved the submittal and request for variance, they observed the material being installed, and are responsible for all cost associated to remove the installed material and utilize copper.

162. The Navy breached its duty of good faith and cooperation.

163. As a result, Hammer incurred additional costs of $5,056.

164. Plaintiff demands judgment against the defendant in the sum of $5,056 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT XI

## BREACH OF THE DUTIES OF GOOD FAITH AND FAIR DEALING: ACTIVITY B192-020 (Clear & Grub Magazine Site - Magazine)

165. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

166. During the construction phase of the magazine, the Navy determined that wanted to have a much larger area cleared around the magazine site than it had originally communicated.

167. Hammer's contract only called for a limited amount of clearing.

168. So, the Navy had another contractor cut the timber and remove it from the site.

169. However, all the limbs and debris from the cutting was left on site for Hammer to remove.

170. Hammer additionally had to remove all surface vegetation from the larger area, then pile it up, and then wait on the Navy to decide how to dispose of it.

171. This additional work took place after Hammer was given the notice to proceed with the actual construction of the magazine, and many months after Hammer had already performed its contractually required clearing and grubbing.

172. Hammer was never compensated for this additional work.

173. The additional work also interfered with Hammer's progress of the construction magazine.

174. The Navy breached its duty of good faith and cooperation by requiring Hammer to perform additional work outside the scope of the contract requirements, and then fail to compensate Hammer for this work.

175. As a result, Hammer incurred additional costs of $19,929.

176. Plaintiff demands judgment against the defendant in the sum of 19,929 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT XII

## BREACH OF THE DUTIES OF GOOD FAITH AND FAIR DEALING: BUILDING 192 (Changed Drawings – Magazine)

177. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

178. Hammer made its first concrete pour on March 28, 2002, when it poured the footings at the Magazine.

179. The second concrete pour was on April 3, 2002, when Hammer poured the stem walls at the Magazine.

180. During an inspection before the next pour, it was discovered that the drawings the Navy supplied to Hammer from which to build were not the same drawings that the Navy Contract Administrator was using for review.

181. Specifically, the Navy Contract Administrator's drawings had additional steel members and denoted different methods of construction.

182. This disruption delayed Hammer's progress for approximately one month.

183. Hammer had to remove forms and reset forms, rebar inserts had to be revised to meet the Navy's drawings, and electrical conduit installation was also revised.

184. The barrel of the Magazine was already poured when the changes were identified, and the electrical work on the first set of drawings showed everything surface mounted, while the second set of drawings showed the electrical work roughed into the concrete.

185. The initial disruption to Hammer's progress caused a stoppage of work to determine the differences between the two set of drawings, and then modify Hammer's subcontracts to incorporate the differences.

186. Additionally, the disruption precluded Hammer's project management from work at the Magazine.

187. The Navy has never provided a reason as to why it provided Hammer with the wrong set of drawings to build from.

188. The Navy breached its duty of good faith and cooperation by providing Hammer with incorrect drawings to build from, allowing them to begin performance, and then providing them with the correct drawings.

189. As a result, Hammer incurred additional direct costs of $8,919.

190. The Navy is responsible for these additional costs.

191. Plaintiff demands judgment against the defendant in the sum of 8,919 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## COUNT XIII

## BREACH OF THE DUTIES OF GOOD FAITH AND FAIR DEALING: BUILDING 192 (Magazine Concrete Pour Issue- Magazine)

192. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

193. Prior to the first concrete pour at the Magazine, Hammer submitted a Request for Variance to use pea-gravel instead of the specified number 57 stone.

194. Hammer and its subcontractors recognized that the 57 stone could cause defects in the concrete due to the large amount of rebar to be installed in the forms. Essentially, there was so much steel designed to be placed in the forms that there was not enough room for the larger stone to pass between the forms and the rebar.

195. Hammer's Request for Variance included statements from both the concrete supplier, and the concrete installation subcontractor stating that the smaller stone would be required to ensure an acceptable pour.

196. However, the Navy Contract Administrators denied Hammer's request for variance to use the smaller stone.

197. Therefore, Hammer poured the concrete as specified in the Navy's design documents.

198. As Hammer began pulling its forms in the following days, a considerable number of defects became evident. These defects included honeycombed areas on both the interior and exterior surfaces where the stone in the concrete was unable to fit between the framework and the rebar, thereby leaving voids, and in some areas exposing rebar.

199. These defects were the direct result of the Navy's refusal to allow the use of pea-gravel.

200. Hammer had previously recognized the possibility of these defects if the larger stone was utilized.

201. The Navy was properly notified of the possibility of defects, and therefore the Navy is responsible for the costs associated with curing the defects.

202. As early as May 7, 2002, Hammer proposed a fix for the situation using Sikadur 31, Hi Mod Gel.

203. The Navy Contract Administrators waited until June 3, 2002, to respond to Hammer's proposal, whereby they disproved the proposed method of curing the defects.

204. During the month of May, Hammer made what progress it could by setting some forms and installing some electrical work. However, the overall production at the Magazine Building tapered down to the point that Hammer could make little or no progress.

205. Finally, on July 27, 2002, the Navy approved the use of a Sika 144 product to make the necessary repairs.

206. The Navy breached its duty of good faith and cooperation by denying Hammer's Request for Variance, which notified the Navy of possible defects, and then subsequently requiring Hammer to cure the defects.

207. As a result, Hammer incurred additional costs of $38,420.

208. Plaintiff demands judgment against the defendant in the sum of $38,420 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

**COUNT XIV**

**BREACH OF THE DUTIES OF GOOD FAITH AND FAIR DEALING:**

**BUILDING 150 (Elevator Issue – Trainer Building)**

209. Plaintiff realleges paragraphs 1-30 as if fully set out herein.

210. Building 150, which included the installation of an elevator, was part of Phase A of the Contract.

211. On September 11, 2002, Hammer originally submitted the elevator package to the Navy.

212. On September 18, 2002, the Navy informed Hammer that its submission was not approved.

213. Then, on October 4, 2002, Hammer resubmitted the elevator package, which was not approved by the Navy until March 19, 2003.

214. A review of Section D1000, Conveying Systems of the RFP, demonstrates that this section is a standard set of specifications for an elevator system. The only specific requirement in the specification was at Section 2.1.1, Passenger Elevators under item "a," which states:

> a. Typical number of personnel & type of freight.
> (1) Must accommodate the maneuverability of one electric power wheelchair, about 60" in length (older model).

215. Based on the foregoing requirement, and conversations with the Navy Contract Administrators, it was clear that the Navy's design intent was not for a full size passenger elevator.

216. The requirement for an elevator from the first floor to the second floor was for one handicapped employee of the government that would need access between floors.

217. In spite of this fact, when Hammer submitted the wheelchair lift in September of 2002 it was rejected by the Navy.

218. Ultimately, Hammer spent October of 2000 though March of 2003 attempting to get approval for the elevator system at Building 150.

219. Although, the RFP clearly contemplated the building of a wheelchair lift, the Navy Contract Administrators required Hammer to build a full-sized passenger elevator.

220. The Navy is responsible for the delay regarding this elevator and all cost associated with the installation of a full-sized passenger elevator.

221. The Navy breached its duty of good faith and cooperation by requiring Hammer to build a full-sized passenger elevator and then failing to compensate Hammer for this work.

222. As a result, Hammer incurred additional costs of $27,200.

223. Plaintiff demands judgment against the defendant in the sum of $27,200 for damages caused by defendant's breach of its duty of fair dealing and cooperation, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

**COUNT XVI**

**BAD FAITH**

224. Plaintiff realleges paragraphs 1-224 as if fully set out herein.

225. The Navy Contract Administrators willfully administered this contract with a specific intent to injure Hammer, and animus toward Hammer and it's employees.

226. The uncooperative manner in which the Navy administered this contract coupled with the Navy's statements that it was going to put Hammer "out of business" on this contract demonstrate this fact.

227. Plaintiff demands judgment against the defendant in the sum of $950,000.00 for damages caused by the defendant's bad faith acts of delaying and hindering the plaintiff in its performance of this contract, and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act, and statutory interest.

## ADDITIONAL DAMAGES

228. In addition to the actual direct costs listed in paragraphs 1-223, Hammer seeks damages and relief consistent with the following:

| | | |
|---|---|---|
| A) | Extended General Conditions: | $195,935 |
| B) | Added Supervisory Personnel: | $68,377 |
| C) | Remission of Liquidated Damages for Supply Building: | $174,300 |
| D) | Remission of Liquidated Damages for Project: | $88,400 |
| E) | Release of Retention: | $28,978 |
| F) | Continental Plumbing's Pass Through REA: | $108,504 |
| G) | Extra Contract Administration | $26,136 |

229. The foregoing damages are consistent with the analyses and calculations set forth in *Hammer's Request for Equitable Adjustment and Certified Claim, Contract N62467-00-C-0288, T-45 Aircraft Support Facilities, NAS, Meridian* submitted to the Navy on January 20, 2006.

Wherefore, Premises Considered, the plaintiff respectfully requests this Court to enter judgment against the defendant consistent with the foregoing.

Respectfully submitted this the 13th day of February, 2008.

Howell Roger Riggs
Patrick O. Miller
Timothy P Pittman.
DICK RIGGS MILLER LLP
Attorney's for Hammer LGC, INC.
200 Clinton Avenue, Suite 1050
Huntsville, Alabama 35801
Tele: 256-564-7317
Fax: 256-564-7319

Email: hriggs@drmslaw.net
pmiller@drmslaw.net
tpittman@drmslaw.net